```
1              UNITED STATES DISTRICT COURT
                   DISTRICT OF MINNESOTA
2
   ------------------------------------------------------------
3                               )
    United States of America,   )   File No. 13-mc-087
4                               )             (SRN/TNL)
            Petitioner,         )
5                               )
    vs.                         )   Saint Paul, Minnesota
6                               )   April 25, 2018
    John K. Thornton,           )   9:30 a.m.
7                               )
            Respondent.         )
8  ------------------------------------------------------------
9
        BEFORE THE HONORABLE SUSAN RICHARD NELSON
10           UNITED STATES DISTRICT COURT JUDGE
                 (CIVIL CONTEMPT HEARING)
11
   APPEARANCES
12   For the Petitioner:     UNITED STATES ATTORNEY
                             BAHRAM SAMIE, AUSA
13                           300 South Fourth Street
                             Suite 600
14                           Minneapolis, Minnesota 55415

15   For the Respondent:     JOHN K. THORNTON, PRO SE
                             4128 Utica Avenue South
16                           St. Louis Park, Minnesota 55416

17   Court Reporter:         CARLA R. BEBAULT, RMR, CRR, FCRR
                             316 North Robert Street
18                           Suite 146 U.S. Courthouse
                             Saint Paul, Minnesota 55101
19

20

21
        Proceedings recorded by mechanical stenography;
22   transcript produced by computer.

23

24

25
```

1                          **I N D E X**

2     WITNESSES:                                          PAGE
      RICHARD WALLIN
3          Direct Examination by Mr. Samie               14
           Cross-Examination by Mr. Thornton             45
4     JOHN K. THORNTON
           Examination by the Court                      51
5          Cross-Examination by Mr. Samie                63
           Re-Examination by the Court                   76
6

7


8     EXHIBITS                                          REC'D
      Government Exhibit 1                                23
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

**IN OPEN COURT**

1

2

3

4        THE COURT:  We are here this morning in the matter

5   of the United States of America versus John Thornton.  This

6   is miscellaneous file number 13-87.  Let's begin by having

7   appearances by the Government, please.

8        MR. SAMIE:  Good morning, Your Honor.  Assistant

9   United States Attorney Bahram Samie appearing on behalf of

10   the United States of America.

11        THE COURT:  Very good.  And Mr. Thornton, you

12   appear to be here today.  Would you please announce your

13   presence.

14        MR. THORNTON:  My name is John Kirk Thornton.

15        THE COURT:  All right.  This case has a long

16   history.  It arises from the Government's petition to

17   enforce two IRS summons that were issued many years ago now.

18   One of those summons sought information to further an

19   investigation into the collection of Mr. Thornton's income

20   tax liability for the tax years 2001 to 2003, and one sought

21   information to calculate Mr. Thornton's income tax liability

22   for the tax years 2004 through 2012 for which he did not

23   file a return.

24        There have been a number of proceedings that will

25   be laid out further in my order to show cause why

1    Mr. Thornton shouldn't respond to these administrative

2    summonses.  And there have been a number of decisions by the

3    Magistrate Judge in this case, by the District Court Judge.

4    It's gone up to the Eighth Circuit once in fact.  In fact,

5    there was an effort to bring it to the United States Supreme

6    Court.

7            On March 27th of 2015, this Court found

8    Mr. Thornton in constructive civil contempt of court for

9    failing to comply with an August 1, 2014 order.  That in

10   fact was affirmed by the Eighth Circuit Court of Appeals.

11           A bench warrant was issued on February 2nd, 2016

12   and the United States Marshal Service apprehended

13   Mr. Thornton on March 20th, 2018.  On that day he appeared

14   before Magistrate Judge Leung, or perhaps it was the next

15   day, for an initial appearance on the finding of civil

16   contempt and Judge Leung issued a stay of the bench warrant

17   until today, April 25th, 2018.

18           So we are here today to finally resolve the issue

19   of Mr. Thornton's civil contempt.

20           Mr. Samie, do you wish to be heard?

21           MR. SAMIE:  Good morning, Your Honor.

22           THE COURT:  Good morning.

23           MR. SAMIE:  Your Honor, there are presently a

24   couple of matters that are currently pending before the

25   Court.  There have been a number of I'll call them

1    miscellaneous motions filed by Mr. Thornton since the March

2    21st, 2018 hearing in front of Magistrate Judge Leung

3    seeking a variety of relief in this case.  The Government

4    has -- I believe the Court ruled on a scheduling motion but

5    I think maybe six or seven motions still remain outstanding.

6         The Government has provided its answer in filings

7    in opposition to those motions on the record.  The

8    Government's prepared to discuss those motions here today or

9    is also happy to rest on its written pleadings.

10        THE COURT:  The Court has reviewed those motions,

11   has received the Government's response to all of those

12   motions.  Let me just for the sake of the record make sure

13   we have a good docket on that.

14        There was a motion at Dockets 112 and 113 filed on

15   March 26th, Expedited Motion to Provide Evidence of a Debt

16   Due and Owing or a Tax Liability on April 5th.

17        An Expedited Motion to Dismiss for Lack of Subject

18   Matter Jurisdiction on April 4th.

19        An Expedited Motion to Dismiss on April 10th.

20        An Expedited Motion for the Court to Identify the

21   Evidence That is "Clear and Convincing" on April 13th.

22        An Expedited Motion to Strike the Government's

23   Response on April 17th.

24        An Expedited Motion to Dismiss as the Essential

25   Elements of Nelson's Order Do Not Exist.

1          Those are the motions that the Court has on its

2     docket.  I suppose, Mr. Samie, I will permit Mr. Thornton to

3     be heard briefly on those motions.

4          Mr. Thornton, very briefly, you may come forward.

5          MR. THORNTON:  The motions are self-explanatory as

6     far as the content so I would like to be ruled on.  I think

7     there's obviously substance there and facts missing and I

8     would like to make my statement if I could right now.

9          THE COURT:  Does the statement relate to the

10    motion, sir?

11         MR. THORNTON:  It does not.

12         THE COURT:  All right.  I think you'll get a

13    chance to do that, but you may stay right there.  The Court

14    has reviewed the motions and the Government's response.

15    I've given Mr. Thornton an opportunity to be heard on the

16    motions.  He wishes to rest on the statements and the

17    papers.  Those motions are denied.

18         Okay.  We'll turn to the substance of the hearing

19    now.  You may read your statement.  Before you do, let me

20    ask you a question.  Do you wish to be represented by

21    counsel, sir?

22         MR. THORNTON:  I do not.

23         THE COURT:  Do you understand that there are

24    benefits, huge benefits, to being represented by a lawyer,

25    particularly when your liberty is at risk, which it is

1    today?  Lawyers go to law school for the purpose of learning

2    about the law and lay people simply can't have that level of

3    understanding of how the system works; and your filings

4    reflect the fact that, of course, as any person that you

5    haven't gone to law school and do not understand the law

6    that applies here.  And so there would be a great benefit to

7    you in having a legal advisor who could -- could give you

8    guidance about the law.

9         Have you given careful consideration to whether

10   you want to continue to represent yourself and proceed pro

11   se or whether it might make good sense for you to have a

12   lawyer?

13        MR. THORNTON:  No, I'll proceed pro se.

14        THE COURT:  All right.  You may be heard, sir.

15        MR. THORNTON:  My name is John Kirk Thornton, a

16   citizen of Minnesota, domiciled in Minnesota, one of the

17   several states.  I am also a national of the United States

18   as defined in 8 USC 1101 (22)(B), "a person who, though not

19   a citizen of the United States, owes permanent allegiance to

20   the United States."

21        I'm hereby limited in special appearance under

22   threat, duress and coercion with threat of incarceration

23   based on a determination of complied or substantially

24   complied standard of which Mr. Wallin has admitted he had no

25   idea what that means, and I don't understand what it means

1    either.

2              I complied with the summons under threat, duress

3    and coercion yesterday by supplying all the books and

4    records in my possession and all of the books and records

5    available from the bank in violation of the Board of

6    Trustees, of which I am a trustee, that prohibited me from

7    disclosing same to a third party as I have no ownership,

8    security, or beneficial interest in the trust, which

9    Mr. Wallin ignored consistently.

10             Inquisitor Wallin is of the opinion that he has no

11   limits of the questions that he can demand answers to that

12   have no relevance to the summons, and refusing to disclose

13   term definitions imbedded in the questions.  The inquisition

14   was held on April 24th, 2018, with the Inquisitor Wallin

15   asking questions that it is to apparently mimic a

16   deposition; but I have no recourse of refusing to answer,

17   and Wallin refused to answer questions for clarification,

18   refused to define the terms of the questions he was asking,

19   but demanded answers, claimed ignorance, stated I should ask

20   an attorney or Mr. Samie, who has yet to make an appearance

21   previous to this, because counsel for the United States of

22   America.

23             Inquisitions of this type are unconstitutional and

24   prohibited in our republic, as they were prohibited in

25   England long ago, but I was submitted to the exact weapons

1    of Star Chamber use in England that was known as the "cruel

2    trilemma" where first I am forced to answer questions to

3    incriminate myself.  Second, face charges of perjury if I

4    give an unsatisfactory answer determined by my accuser,

5    Mr. Wallin.  And third, that I will be held in Contempt of

6    Court if the Accuser/Inquisitor Wallin states I do not

7    answer or my answer is deemed by the Accuser/Inquisitor

8    Wallin to be unsatisfactory or did not comply or

9    substantially comply.

10              As I am without counsel or an attorney, and

11   further there is not one scintilla of evidence yet entered

12   in this court on the record that presents itself as an

13   adversarial court arising under Article III, Sections 1 and

14   2, I am therefore going to testify by narrative under the

15   penalty of perjury that all my statements are true and

16   correct.  I will not swear an oath due to my religious

17   beliefs.  And further, I will be entering evidence into this

18   court wherein each piece of evidence entered I will answer

19   questions posed by the counselor for the United States of

20   America being the plaintiff-petitioner.

21              First, I have brought all the records that are

22   available to me to this court.  This Court shall take

23   judicial notice of all evidence submitted to this Court.

24              Second, I have a letter to Freedom Enterprises

25   dated March 28th, 2018, that clearly states that the trust

1    Freedom Enterprises is a separate legal entity from me of

2    which I do not receive any compensation from or which I am a

3    trustee, being Exhibit A.

4           Third, I have a copy of the Special Minutes of

5    Board of Trustees for Freedom Enterprises, board minutes

6    where I was denied disclosure of books and records of third

7    parties.

8           Fourth, I received a letter from the Board of

9    Trustees of Freedom Enterprises dated April 10, 2018, being

10   Exhibit C where the Board of Trustees denied my -- denied my

11   request to disclose bank records of Freedom Enterprises

12   Trust by the Board of Trustee, but I supplied this to Wallin

13   in violation of the Board of Trustees.

14          Fifth, I inquired at U.S. Bank as to all records

15   from 2004 through 2013; that they only have them available

16   from 2011 to 2013.  This is evidenced in Attachment B, the

17   U.S. Bank letter.

18          Sixth, as evidenced by Attachment E, bank records

19   from 2011 to 2013, these are all the records in my

20   possession that I can obtain.

21          Seventh, as evidenced by Attachment F, is a

22   current bank account that I opened recently.

23          Eighth, a true and correct copy of my W-4,

24   Attachment G, wherein I marked "exempt".  If there's

25   disagreement with this W-4, therein hopefully someone in

1    this court highly trained and competent in all matters of

2    the IRS as to investigations and collections, I thereby

3    encourage you to identify exactly whom is the withholding

4    agent; and further, which one of the code sections of Title

5    26 that I am identified by as being 26 U.S.C. 1441,

6    nonresident alien; or 26 U.S.C. 1442, foreign corporation;

7    or 26 U.S.C. 1443, foreign organization with the withholding

8    agent only being hold harmless in 26 U.S.C. 1461.

9            The exact term definition "withholding agent" in

10   Title 26 U.S.C. 7701(a)(16) Withholding Agent.  "The term

11   'withholding agent' means any person required to deduct and

12   withhold any tax under the provisions of Section 1441, 1442,

13   1443, or 1461."  Note that all subtitle A income taxes.

14           THE COURT:  Mr. Thornton, I'd just ask you to go a

15   little slower because you know our court reporter is taking

16   down everything.  Thank you.

17           MR. THORNTON:  The people that have this W-4 are

18   unwilling to act as a withholding agent as it covers any tax

19   that is required.  To be withheld in Title 26, they have

20   determined that I am not any of the three entities

21   identified in Sections 1441, 1442, or 1443, all of which are

22   subtitle A entities; and they are unwilling to be liable if

23   I'm not one of the three codes consisting of 1441, 1442, and

24   1443 as found in Section 1461.

25           But if they are wrong, this could easily be

1    remedied by a signed order from this Court or a declaration

2    from Wallin that will hold the people with the W-4 harmless

3    and identify which code sections have applications to me.

4         Also take notice that any term defined that is

5    only in exclusive use of that term "withholding agent" as

6    used by the IRS in Title 26.

7         Ninth, for the record I submit this document.  It

8    is a public record and self-authenticating evidence under

9    Rule 9017, and it is evidence of my political status, my

10   citizenship, and my allegiance being -- the Political Status

11   and Citizenship Allegiance filed in Palmer, Alaska,

12   Recording District 311, identified by number 2016-0223400-0

13   filed on October 9th, 2016.

14        Tenth, I submit my status, exercising my right of

15   suffrage of the elected franchise of a citizen of Minnesota

16   that was accepted by Minnesota, one of the several states

17   evidenced by Attachment I, voter registration.

18        Eleventh, I am a national of the United States as

19   defined in U.S. -- 8 U.S.C. 1101(22)(B), a person, though

20   not a citizen of the United States, owes permanent

21   allegiance to the United States.

22        Twelfth, this Court shall take judicial notice

23   that the claim to be a citizen of the United States with no

24   evidence is a felony as codified in 18 U.S.C. 911.  Whoever

25   falsely and willfully represents himself to be a citizen of

1    the United States shall be fined under this title, or

2    imprisoned not more than three years, or both.

3            Are there any questions from the counselor of the

4    United States of America or any evidence to be submitted

5    that Thornton is a citizen of the United States?  And I have

6    the evidence here.

7            THE COURT:  All right.  Have you provided that to

8    Mr. Wallin and to Mr. Samie?

9            MR. THORNTON:  I gave everything here.  I also

10   added Attachment J, which is a paycheck stub.  I did not

11   include my status and my voter registration with Mr. Wallin

12   yesterday, but I will give a copy to Mr. Samie right now and

13   a copy to the Court, as well.

14           THE COURT:  You may.  You may approach.

15           MR. THORNTON:  Two, one for you.

16           THE COURT:  Okay.  Anything further you wish to

17   say, Mr. Thornton?

18           MR. THORNTON:  No.

19           THE COURT:  All right.  Mr. Samie, I'm not sure

20   how the Government intends to proceed, but it might be

21   helpful to have Mr. Wallin take the stand.  Is that

22   possible?

23           MR. SAMIE:  Thank you, Your Honor.  That's

24   precisely what we'll do at this time.  The United States

25   calls Revenue Officer Richard Wallin to the stand, please.

1        THE COURT:  Very good.  Good morning, Mr. Wallin.

2   If you would just come forward and go right past that

3   witness stand.  You'll see some steps.  If you would walk up

4   the steps, remain standing, turns towards me and raise your

5   right hand.

6        Do you swear in the testimony you're about to give

7   to tell the truth, the whole truth, and nothing but the

8   truth, so help you God?

9        MR. WALLIN:  I do.

10        THE COURT:  Very good.  Please be seated.

11        You'll see that that mic has a moveable base and

12   neck so make it comfortable for yourself, but my hearing is

13   poor so if you could get it close to your mouth that would

14   be great.

15        THE WITNESS:  Okay.

16        THE COURT:  If you would state your full name for

17   the record spelling your last name.

18        THE WITNESS:  My name is Richard A. Wallin.  My

19   last name is spelled W-a-l-l-i-n.

20        THE COURT:  Very good.  Thank you.

21        Counsel.

22                    **DIRECT EXAMINATION**

23   **BY MR. SAMIE:**

24   Q.  Good morning, Revenue Officer Wallin.

25        Could you please introduce yourself to the Court?

1    Where do you currently work?

2    A.  I currently work in the Internal Revenue Service office

3    in Bloomington, Minnesota.

4    Q.  What is your position?

5    A.  I'm a revenue officer.

6    Q.  Are you working in a particular -- do you work in a

7    particular section of the IRS?

8    A.  Yes, I'm in the collection division and I specialize in

9    abusive tax avoidance schemes.

10   Q.  What is that?

11   A.  That's where people think up schemes to try to defeat

12   the filing and paying of federal income taxes that are not

13   legal schemes.

14   Q.  In the course of your work, have you conducted an

15   investigation into the Respondent John Thornton?

16   A.  Yes, I have.

17   Q.  Could you tell the Court a little bit about what the

18   scope of that investigation is?

19   A.  Mr. Thornton owes a large amount of delinquent income

20   taxes.

21            MR. THORNTON:  Objection, speculation.

22            THE COURT:  Overruled.  Go ahead, Mr. Wallin.

23            THE WITNESS:  In excess of $640,000.  And he has

24   some un-filed tax returns.  The ones of interest to us are

25   on the summons.  It goes up through the years 2012.

1    BY MR. SAMIE:

2    Q.  So you referenced just a moment ago a summons.  Can you

3    talk a little bit about -- you issued -- how many summonses

4    did you issue to Mr. Thornton?

5    A.  I issued no summonses.  They were issued by Revenue

6    Officer Jeffrey Wagner.  And he was initially assigned this

7    case and some other internal job opportunities came for

8    Mr. Wagner so they assigned the case to me, especially

9    because it had the earmarks of abusive schemes.

10   Q.  So upon taking over the assignment on this case, did you

11   review everything within the file, the IRS file on this

12   investigation?

13   A.  Yes, I did.

14   Q.  And you reviewed the two summonses that were issued to

15   Mr. Thornton?

16   A.  I did.

17   Q.  And can you describe for the Court what, generally

18   speaking, the two summonses, each one was seeking or is

19   seeking?

20   A.  One summons was seeking income information from numerous

21   sources of income and that would enable Internal Revenue

22   Service to prepare 1040 tax returns for Mr. Thornton for the

23   years involved.

24              MR. THORNTON:  Objection, vague.  What type of

25   tax?

1          THE COURT:  Okay.  Sir, you may object but you

2     can't ask the witness a question right now.  Overruled.

3          THE WITNESS:  And the other summons was to enable

4     me to prepare a collection information statement.  That's

5     the form that we use in our collection division to determine

6     what the ability to pay is of a taxpayer who owes delinquent

7     taxes.

8          MR. THORNTON:  Objection, speculation on the use

9     of the word "taxpayer".

10          THE COURT:  Overruled.

11     BY MR. SAMIE:

12     Q.  Okay.  Did you attend a hearing on March 21st, 2018,

13     regarding this matter?

14     A.  Yes, I did.

15     Q.  And that was in front of Magistrate Judge Leung?

16     A.  Yes.

17     Q.  At that time in your opinion was Mr. Thornton in

18     compliance with the summonses that you had issued?

19     A.  That Mr. Wagner had issued.  No, he was not in

20     compliance.

21     Q.  After that hearing, did you reach out to Mr. Thornton,

22     give him an opportunity, introduce yourself?

23     A.  Yes, I did.  I sent him a letter advising him that

24     Mr. Wagner was no longer the revenue officer assigned to his

25     file; that I was.  And that I was willing to meet with him

1    to resolve the issues.  And I gave him my name and address,

2    phone number, contact information, what hours I'm available,

3    and invited him to contact me so we could set up an

4    appointment that would be mutually agreeable to the both of

5    us that we could try to resolve matters before this hearing

6    today.

7    Q.  Did you hear back from Mr. Thornton?

8    A.  Yes, I did.  I believe it was the 18th.  It was last

9    week.  It was a phone call and he said he was now willing to

10   schedule an appointment.  He said he could either meet with

11   me Monday or Tuesday of this week.  And I said, Well, I was

12   open Monday and I had some training on Tuesday morning, but

13   I would be available Tuesday afternoon, which would be

14   meaning yesterday.  So he said that he would come in at 1

15   o'clock yesterday afternoon.  And we set up the appointment

16   then for -- made the arrangements to meet with him at that

17   time.

18   Q.  And before the phone call, was there any more

19   correspondence between you and Mr. Thornton by mail?  After

20   your initial letter, did he write you back seeking --

21   A.  Yes, he did.  I received a letter and he wanted to know

22   what it was that he needed to bring in to resolve the

23   summonses.  So I composed a letter and reminded him that it

24   was not only documents.  It also included testimony, and he

25   would have to provide testimony concerning the documents

```
 1   that he's bringing in and also testimony regarding the

 2   collection information statement that we needed to fill out

 3   to determine what his ability to pay would be.

 4   Q.  Okay.  Did you complete and submit a declaration

 5   recently with the Court that contains those three letters as

 6   exhibits to that declaration?

 7   A.  Yes, I did.

 8   Q.  Okay.  So let's talk about the interview on -- that was

 9   scheduled for yesterday afternoon at, you said, 1 o'clock?

10   A.  Yes.

11   Q.  Did Mr. Thornton appear at that interview?

12   A.  Yes, he did.

13   Q.  Did he appear alone?

14   A.  No, he brought an observer.

15   Q.  Okay.  Who was the observer?

16   A.  The observer said his name was John Thomas.

17   Q.  Did he identify any relationship to Mr. Thornton?

18   A.  I asked him if he was a licensed attorney.  He said he

19   was not.  If he was a certified public accountant.  He was

20   not.  Or an enrolled agent.  He was not that either.  So I

21   requested Mr. Thornton to give me a signed brief statement

22   that it was okay for Mr. Thomas to be in the room discussing

23   his confidential tax matters.  And both agreed that that was

24   fine and they did that immediately.

25   Q.  So this Mr. Thomas was permitted to stay during the
```

1     course of the interview?

2     A.  Yes, he was.

3     Q.  Is Mr. Thomas present in the courtroom at this time?

4     A.  Yes, he is.

5     Q.  Could you point him out?

6     A.  He is the gentleman in the gray shirt there with the

7     gray hair and his hand by his cheek.

8     Q.  Okay.  Did you ask Mr. Thornton to take an oath swearing

9     under penalty of perjury that the answers to your questions

10    were true, would be true and correct?

11    A.  I did not.  He brought it up himself.  He said, I will

12    not be taking an oath for religious reasons.  And back when

13    Jeffrey Wagner had the case I was an observer of an

14    appointment between Mr. Wagner and Mr. Thornton where that

15    was somewhat of an issue about his Biblical interpretation

16    of taking oaths.  But he said he would tell the truth.  And

17    later on I reminded him during the interview that we not

18    only wanted him to tell the truth but we wanted complete

19    answers as well as true answers.

20           So -- and then when we got done completing the

21    financial collection information statement, there's a place

22    for him to sign where he provided this information under

23    penalties of perjury and he refused to sign that.

24    Q.  Okay.  So at no point during the -- well, I should

25    rephrase that.

1              To summarize, Mr. Thornton refused to take any

2      sort of oath under penalty of perjury regarding the answers

3      he was providing at the interview?

4      A.   That's correct.

5      Q.   Okay.  Did Mr. Thornton provide any -- bring any

6      documents with him to this interview?

7      A.   Yes, he did.  He immediately handed over a packet of

8      documents.

9      Q.   Okay.  For the sake of efficiency I'm going to hand

10     you -- I have just handed you a stack of documents.  Do you

11     have those in front of you?

12     A.   Yes, I do.

13     Q.   Can you take a moment to just flip through those?

14     A.   Yes, these appear to be documents that Mr. Thornton

15     brought to the meeting yesterday afternoon.

16     Q.   Okay.

17              MR. SAMIE:  Your Honor, I don't know if

18     Mr. Thornton has officially offered these into the record

19     but at this time --

20              THE COURT:  I think we should mark those because

21     they are slightly different from what Mr. Thornton has

22     provided to me, and we will make sure that these are

23     officially in the record.  But let's make sure that whatever

24     documents were provided to Revenue Officer Wallin yesterday

25     are marked separately as an exhibit.

1          MR. SAMIE:  Okay.  We will --

2          THE COURT:  Government's Exhibit 1 or A or

3    whatever you want to do.

4          MR. SAMIE:  Okay.  So at this time this stack of

5    documents we'll offer into the record as Government's

6    Exhibit 1.

7          THE COURT:  All right.  Very good.  If you bring

8    them right up here we can get a sticker for it.

9          (Pause in proceedings.)

10          MR. SAMIE:  Your Honor, I mistakenly handed

11   Mr. Wallin the wrong stack.  I'm going to again hand him the

12   stack that's stamped as received by the IRS.

13          THE COURT:  Okay.  Very good.

14          THE WITNESS:  Yes, this stack of materials has our

15   date stamp on it that we stamped when we received these

16   files and it went through Attachment G.

17          THE COURT:  All right.

18   BY MR. SAMIE:

19   Q.  And so just to back up, these are the documents that

20   were provided to you?

21   A.  These are the actual ones, yes.

22          MR. SAMIE:  So at this time, Your Honor, the

23   Government is going to offer this stack of documents as

24   Government Exhibit 1.

25          THE COURT:  Any objection, Mr. Thornton?

1          MR. THORNTON:  I have a question.  How are my

2     documents in evidence marked?

3          THE COURT:  We will -- we haven't done that yet

4     and when you get up we can mark those as Defendant's Exhibit

5     1, okay?

6          Government Exhibit 1 is received into evidence.

7     BY MR. SAMIE:

8     Q.  Mr. Wallin, can you -- if we take a minute, there's a

9     number of attachments that are part of this Government's

10    Exhibit 1.  I think you mentioned just a moment ago that it

11    goes through Attachment G?

12    A.  Yes.

13    Q.  Okay.  I'd like to go through some of these with you in

14    a moment but I wanted to ask you specifically about a couple

15    topics that may have come up during your questioning of

16    Mr. Thornton yesterday.

17         First, this topic of trusts.  Did you ask

18    Mr. Thornton about any trusts that he may have any sort of

19    affiliation with?

20    A.  Yes, I did.

21    Q.  Can you tell me how this topic came up?

22    A.  Well, I had planned on discussing it a little further on

23    but because he provided this packet of information, one of

24    the first things that's on there on Attachment A was a

25    lengthy document, a letter, and another document that is

1    Attachment C, and a board meeting that's Attachment B

2    concerning one of the trusts, Freedom Enterprises.

3         And he had something that I wasn't sure I totally

4    understood, but he had asked permission from the Board of

5    Trustees of this trust if he was allowed to discuss any

6    trust matters with me at this appointment.

7    Q.  Okay.  We'll get to that in a second.

8    A.  Okay.

9    Q.  So this trust, Freedom Enterprises, did he mention any

10   other trusts that he was affiliated with?

11   A.  Yes, further on in our discussion we discussed two other

12   trusts that he -- he is a trustee for.  He acknowledged he

13   was a trustee of Freedom Enterprises and he acknowledged he

14   was the trustee of two other trusts.

15   Q.  Was Independent Liberties Trust the name of one of them?

16   A.  Yes, it was.

17   Q.  Was Business Management Alliance Trust the name of the

18   third?

19   A.  Yes, it is, yep.

20   Q.  Okay.  Did Mr. Thornton provide any documentation

21   related to those two trusts, the Independent Liberties Trust

22   or the Business Management Alliance Trust?

23   A.  No, he did not.

24   Q.  Okay.  Did you ask Mr. Thornton any specific questions

25   about what his relationship to these trusts is?

```
 1    A.  Yes.  I asked if he was a trustee of those trusts.  He

 2    acknowledged he was.  He said he was one of the trustees.  I

 3    said who are the other trustees and he couldn't recall who

 4    the other trustees were.

 5    Q.  You say were?

 6    A.  Or are.

 7    Q.  So he acknowledges that he is a trustee for these three

 8    trusts, a trustee?

 9    A.  A trustee, yes.

10    Q.  He acknowledged that there are other trustees for these

11    three trusts?

12    A.  Yes.

13    Q.  But he would not answer any questions identifying who

14    the other trustees of these trusts were?

15    A.  Yes.

16    Q.  Or are?

17    A.  Yes.

18            MR. THORNTON:  Objection, speculation.

19            THE COURT:  Overruled.

20    BY MR. SAMIE:

21    Q.  Revenue Officer Wallin, did you ask Mr. Thornton about

22    who the beneficiary or beneficiaries of these three trusts

23    are?

24    A.  Yes.

25    Q.  What was his answer?
```

1    A.  And he couldn't recall, but he said he was not -- he was

2    not a beneficiary, nor was he a settler of the trust.  He

3    did not provide money for the corpus of these trusts.  He is

4    a trustee.  At one point he says he is a "voluntary trustee"

5    but I've never heard of someone being a "voluntary trustee"

6    but that's what he said.

7    Q.  Okay.  So he specifically said that he is not a

8    beneficiary -- to the best of your recollection, did he

9    specifically say he is not a beneficiary of these three

10   trusts?

11   A.  Yes.

12   Q.  And did he talk about what powers he has in his capacity

13   as a trustee of these three trusts?

14   A.  I believe I asked him about check signing and being on

15   the bank, you know, bank accounts.  Unfortunately it was a

16   nearly two-hour conference and it was being tape recorded;

17   but because it didn't end until late yesterday afternoon, we

18   are unable to have a written transcript.  And it would have

19   been a little easier to give complete and concise answers to

20   all these questions, but to my recollection he says his role

21   is only as a trustee and not a beneficiary; and he had no

22   knowledge of any of the other workings of the trust for the

23   most part.

24   Q.  You said a moment ago that he said that he has check

25   writing authority for the trusts?

1    A.  Yes.

2    Q.  Okay.  When you asked him if he -- when he -- excuse me,

3    I'll back up.  You testified a moment ago that he stated

4    that he's not a beneficiary of these three trusts.  Did you

5    ask him who the beneficiary or beneficiaries are?

6    A.  I believe I did.

7            MR. THORNTON:  Objection, that's not true.

8            THE COURT:  You will have a chance.  Overruled.

9            THE WITNESS:  I believe I did, but I'm here under

10    oath and I don't have the benefit of seeing the transcript

11    or having listened to the tape over again.  We asked several

12    hundred questions of Mr. Thornton but I know for a fact that

13    he said he's not a beneficiary.  He has no beneficial

14    interest in these trusts.

15    BY MR. SAMIE:

16    Q.  Did he say whether or not he was able to -- did he say

17    or volunteer that he does not know who the beneficiaries of

18    the trust are or he can't remember?

19    A.  He would say, "I don't recall."  Usually he would say he

20    doesn't recall things.

21    Q.  So he doesn't recall who the beneficiaries are for the

22    trusts that he is a trustee for and for which he has check

23    writing authority?

24    A.  Yeah.  I'm sure I asked him, you know, who are the

25    beneficiaries.  If you are not the beneficiary, who are

1    they?  And he was unable to tell me who might be the

2    beneficiary of those trusts.

3    Q.  Okay.  Can you turn to Attachment E in this Government's

4    Exhibit 1?

5         This is a -- looks like a 79-paged attachment that

6    contains bank records.  Is that correct?

7    A.  That's correct.

8    Q.  And these are bank records from what looks like an

9    account held with U.S. Bank?

10   A.  Correct.

11   Q.  Could you identify what the name of the account is?

12   A.  The account is in the name -- the first name line is

13   Straightedge Enterprizes, Inc.  And "Enterprizes" is spelled

14   with a "z" towards the end.

15   Q.  Z-e-s?

16   A.  Z-e-s, yes.

17   Q.  And I said, Well, that's the name of the account, right?

18   A.  And then Mr. Thornton says, Well, you have to read the

19   whole thing as one.  He says it's Straightedge Enterprizes,

20   Inc. Management Trust Account for Freedom Enterprises.  And

21   to him there was a distinction to be made there.

22   Q.  Okay.  Now, there are a series of months that these --

23   that this statement for this bank account are provided.  And

24   it looks like it's the first one is May 31st of 2011.  Is

25   that right?

1    A.  That's correct.

2    Q.  And if you turn to -- if you turn to page 72 of

3    Attachment E, it looks like this is the last page of a

4    bank -- excuse me -- of a bank account statement for this

5    account for the period from June 3rd, 2013, through June

6    30th, 2013?

7    A.  That's correct.

8    Q.  Okay.  And then the next page, 73, looks like we jump to

9    December 1st, 2017 through December 29th, 2017?

10   A.  That's correct.

11   Q.  Okay.  And then that goes through on page 79, looks like

12   the last statement period is March 1st, 2018, through March

13   30th, 2018; is that right?

14   A.  That's correct.

15   Q.  Okay.  So based on your review of this attachment, is

16   it -- would it be correct to say that the statements

17   provided for this account are from May 2nd, 2011, through

18   June 30th, 2013; and then from December 1st, 2017, through

19   March 30th, 2018?

20   A.  That would be correct.

21   Q.  Okay.  And so there's a gap in there of a couple years,

22   a few years?

23   A.  Yeah, from '13 to -- four and a half years.

24   Q.  Okay.  I just want to quickly turn to -- well, let's

25   just start on the very first page here.  Page 1 of

1    Attachment E.  There are a number of, it looks like, $500

2    withdrawals, ATM withdrawals?

3    A.  Yes.

4    Q.  How many do you see there for just this first statement?

5    A.  There are six on page 1.

6    Q.  Six on page 1 and then another?

7    A.  And there are 9 more withdrawals of $500 on page 2 of

8    79.

9    Q.  Okay.  So there's quite a bit of activity in terms of

10   ATM withdrawals of $500, at least from May 2nd, 2011 through

11   May 31st, 2011, from this account?

12   A.  That's correct.

13   Q.  All right.  As you flip through the other statements for

14   the other months during this statement period, do you see

15   similar activity of frequent withdrawals of $500, ATM

16   withdrawals of $500?

17   A.  Yes, it's almost exclusively $500 withdrawals from ATMs

18   as I go through this -- page through this exhibit.

19   Q.  Okay.  Did Mr. Thornton provide any testimony about what

20   these -- what these withdrawals, what this money was used

21   for?

22   A.  Well, one thing he says, he donates a -- does a lot of

23   volunteer work and donates a lot of money to charity.

24   Q.  Well, I want to back up again.  I'm asking specifically

25   about the trust bank accounts.  When you asked him questions

1    about the trust documents, what would be his answer?  Did he

2    have a standard answer that he would provide?

3    A.  He had a standard answer.  Usually he would say some

4    variation of a statement.  He'd say I have no ownership

5    interest, security interest, or beneficial interest.  Some

6    combination, maybe missing a word or two or in different

7    orders, but basically those three types of interests he

8    denied have an interest in and was ignorant of what they may

9    represent.

10   Q.  Okay.  So to -- would it be correct to say that aside

11   from providing these documents regarding the management --

12   excuse me, the Freedom Enterprises Trust, when asked

13   follow-up questions directly related to the management of

14   the trust, the creation of the trust, that Mr. Thornton

15   would provide an answer like you just gave?

16   A.  Yes.  Multiple, -- many multiple times, yes.

17   Q.  Approximately how many questions did you ask, specific

18   follow-up questions about this trust or the other two trusts

19   that you previously identified?

20   A.  Oh, I hate to be held to a number but I would -- I came

21   back to it from time to time because when we were asking

22   questions for the collection information statement there's a

23   section there about trusts as well, so I revisited the

24   topic.  So I don't know, maybe ten, half a dozen to a dozen

25   times maybe, in some shape or form asking questions about

1    these trusts and his role with the trust and roles of other

2    people with the trusts.

3    Q.  Could you explain for the Court why would a collection

4    information statement involving John Thornton as an

5    individual, why would it be pertinent to ask for questions

6    about trusts?

7    A.  Well, there are certain types of trusts, depending upon

8    how they are created -- now I'm not an attorney but I do

9    have somewhat of a knowledge about the use of trusts in

10   abusive tax schemes.  If a trust is set up in a certain way,

11   the income to the trust is actually reportable on a personal

12   individual 1040 tax return of that individual.  And there

13   are other ways that trusts can be set up where the trust is

14   responsible for reporting the income on a fiduciary return

15   of its own.

16        So a determination needs to be made any time

17   anybody comes to us and says that there's a trust involved

18   as to whether they are reporting the income of the trust on

19   their personal returns or they are reporting it on a

20   fiduciary return.  But it has to be reported one place or

21   the other.

22   Q.  And here there was no such reporting?

23   A.  I found no reporting for the years involved for Freedom

24   Enterprises Trust --

25   Q.  Okay.

1    A.   -- on fiduciary returns for the years in question.

2    Q.   And what about the other two trusts?

3    A.   I didn't find any information about fiduciary returns on

4    those either.

5    Q.   Okay.  So suffice it to say as part of your

6    investigation into both the income tax liability for

7    Mr. Thornton for the years in question, '04 through I think

8    2012, as well as a snapshot of what his current assets are

9    that might be subject to seizure in payment of past owed tax

10   liability, it's relevant for your investigation to get some

11   answers about the details of these trusts that he is

12   affiliated with?

13   A.   That's correct.

14   Q.   Okay.  Do you believe that you obtained sufficient

15   answers from Mr. Thornton during your interview yesterday?

16   A.   I did not.

17   Q.   Okay.  Quickly on paragraph -- excuse me, on Attachment

18   C to Government's Exhibit 1, let me know when you have that.

19   A.   I have it.

20   Q.   Paragraph 15 it says:  "The trustee's powers shall be

21   construed as general of citizen/inhabitants of these United

22   States of America to do anything any citizen/inhabitant may

23   do in any state or any country as governed by common law

24   which shall govern all of the powers of this contract of

25   indenture."

1          The next sentence:  "They shall," again, the

2     trustee's powers, "They shall, but are not limited to,

3     continue in business, conserve the property, commercialize

4     their resources, extend any established line of business in

5     industry or investment as herein specifically noted at their

6     discretion for the benefit of the business trust such as:

7     buy or sell mortgages, securities, bonds, notes, leases of

8     all kinds, contracts or credits of any form; patents,

9     trademarks or copyrights; buy, sell or conduct mail order

10    business, or branches thereof, operate stores, shops,

11    factories, warehouses, or other trading establishments or

12    places of business."  And it kind of goes on and on, right?

13    A.   Yes.

14    Q.   There's a description of powers and authorities of the

15    trustees.  Is that correct?

16    A.   That's correct.

17    Q.   And again, Mr. Thornton acknowledged during the

18    interview yesterday that he is a trustee and he would then

19    have these powers if what is presented in this paragraph is

20    correct?

21    A.   Yes, he acknowledged he was a trustee.

22    Q.   Okay.  And to the extent that this paragraph discusses

23    any other assets held by this trust, if those assets would

24    be attributable to Mr. Thornton, your knowledge regarding

25    those assets would also be relevant to your investigation?

1    A.   That's correct.

2    Q.   Okay.  Did you receive any information of any other

3    assets related to the Freedom Enterprises Trust?

4    A.   The only information basically was these bank -- the

5    bank statements.

6              THE COURT:  Mr. Samie, could I ask a question?

7              Sir, did he say that the withdrawals that are

8    represented on these bank statements were withdrawals that

9    he made?  In other words, why was he providing these bank

10   statements to you?

11             THE WITNESS:  The summons instructed him, for

12   those tax years involved, anything that might be considered

13   income from a trust, I believe.

14             THE COURT:  Okay.  So did he say this represented

15   income to him from a trust; that he took these withdrawals

16   out?

17             THE WITNESS:  He said no on all -- in that series

18   of questions, he either said no or I don't recall.  He never

19   said, Yeah, I got that money and I spent it.  He never would

20   say that.

21             THE COURT:  Did he say why he brought this

22   document to you if it doesn't include any monies he

23   received?

24             THE WITNESS:  No, he just said these are the

25   documents that I have available to me in response to the

1      summons.

2                 THE COURT:  All right.

3                 THE WITNESS:  It was kind of in that -- in his

4      opening remarks it was pretty much the same statement that

5      he made when he arrived at the meeting yesterday.

6                 THE COURT:  Then if you look at the two, for

7      instance, if you go to page 54 of Attachment E, just as an

8      example -- or a better one is page 64 for the account period

9      April 1st, 2013 through April 30th, 2013.  In addition to

10     these $500 withdrawals there are deposits from Grove

11     Technical.  Did you ask him about that?

12                THE WITNESS:  Not that one specifically but I

13     said, Well, what do these trusts do?  What is their -- what

14     business do they have then that generates income?  And he

15     said -- what is the word that he used -- I think consulting

16     or contract work.  And I said, Well, what does that mean?

17     And after some probing, it sounds like it's for services

18     computer related, like repairing computer or adjusting

19     computer software, something computer related.

20                THE COURT:  So is the sense you had that perhaps

21     he earns this money, he deposits it into a trust bank

22     account, he withdraws money from that trust bank account,

23     and he believes that protects him from not having to

24     disclose that to the IRS or pay taxes on it?

25                THE WITNESS:  That is a common belief by people

1    that use abusive schemes.

2           THE COURT:  Right.  But did you have that

3    conversation with him?

4           THE WITNESS:  I didn't accuse him of having an

5    abusive scheme.

6           THE COURT:  So I'm just asking whether -- how

7    these deposits and withdrawals occurred.  If you said, Okay,

8    you've given me these files.  Let's walk through them.  Did

9    you make these deposits?  Did you make these withdrawals?

10   Are you saying you did ask those questions and he doesn't

11   recall any of it?

12          THE WITNESS:  He pretty much doesn't recall

13   anything.  He says it goes back a ways, but he doesn't -- I

14   would say he was nonresponsive.  But he is the one that

15   brought these in and gave them to me.  And basically he just

16   says I brought them in.  I was the trustee and I have these

17   records.  And I don't know who the other trustees are and --

18          THE COURT:  Did you ask him how he earns a living?

19          THE WITNESS:  Yes, later on in the interview.

20          THE COURT:  And did he say when he gets paid where

21   he deposits those checks?

22          THE WITNESS:  Yes, that's exhibit -- Attachment F.

23          THE COURT:  Okay.  We haven't gotten there yet.

24   But he didn't ever say to you that he deposited his checks

25   in this particular U.S. Bank account?

1    THE WITNESS: I don't recall ever asking a

2    question if he physically made those deposits.

3    THE COURT: So as we sit here after your

4    interview, you don't know what the relevance of this U.S.

5    Bank document is? You don't know what his connection is to

6    it?

7    THE WITNESS: I have my suspicions.

8    THE COURT: Right. That's not what I'm interested

9    in. You need more information.

10    THE WITNESS: I would think I would need some more

11    information.

12    THE COURT: All right.

13    All right. Go ahead, Mr. Samie.

14    MR. SAMIE: Thank you, Your Honor.

15    BY MR. SAMIE:

16    Q. I want to -- well, now that we're on the topic of the

17    Attachment F, could you turn to Attachment F?

18    A. Yes, I have it here.

19    Q. Okay. What is this document? Now, this looks like a

20    bank statement from TCF Bank.

21    A. Yes, it is.

22    Q. This is in Mr. Thornton's name personally?

23    A. Yes.

24    Q. Okay. And then, just like we did with the other

25    documents, the dates on the bank statements provided or

1   included in Attachment F are -- looks like a statement

2   date -- for the first one the statement period is November

3   18th, 2017 through December 19th, 2017?

4   A.  Yes.

5   Q.  And then the last one provides a statement period --

6   this is page 5 of Attachment F -- a statement period from

7   February 17th, 2018, through March 20th, 2018.  Is that

8   correct?

9   A.  That is correct.

10  Q.  And so what did he say that this bank account or this

11  bank statement reflects?

12  A.  Well, he told me he now has a job, a regular job, and he

13  deposits his paychecks into this account.  And he set up

14  this account -- I believe, if I'm not mistaken, I believe he

15  said after he got the job -- he does not trust banks but he

16  got a bank account at TCF Bank.  And these are what's

17  happened the last three or four months on that account.

18  Q.  Did -- do you know what his line of work is?

19  A.  I asked him about that and he said he works for a

20  company that provides -- finds other companies that need

21  computer work, a computer expert to step in and fix whatever

22  computer issues they might have.  And that's him, and he

23  said he primarily is able to do that work out of his house.

24  Q.  Okay.  Going through these statements quickly, do you

25  see -- well, you know, he testified and you testified a

1   moment ago that he talked about where the income to this

2   account was coming from his job.  Is that accurate?

3   A.  Correct.

4   Q.  Do you see any system, similar activity in terms of

5   withdrawals that tracks or, I should say, that is similar to

6   the activity in the trust account?

7   A.  Yes, I do.  He is taking numerous $500 ATM withdrawals

8   on a pretty consistent basis throughout these.  Some of them

9   are from $503 and I assume there must be probably a $3.00

10  fee for using the ATM.  But by and large there's quite a few

11  withdrawals in the $500 to $503 range on these statements.

12  Q.  Okay.  Let's move past the trusts for a moment now.  I

13  want to ask you about -- this is a good segue -- withdrawals

14  of $500 at a time, again, as we can see here from his own

15  personal account, would lead you to believe that there would

16  be a considerable amount of cash that he would possess in

17  hand?

18  A.  Yes, I did consider that.

19  Q.  Okay.  Did you ask him about how much cash he has as a

20  present asset?

21  A.  Yes, that's one of the questions on our collection

22  information statement.  How much cash money do you have on

23  hand.

24  Q.  What was his answer?

25  A.  He said he wasn't sure.  He couldn't recall exactly how

1   much cash money he had.

2   Q.  When you meant on hand, you meant in his home as well as

3   on his person?

4   A.  Yeah.  I said, Well, how much do you have at home or how

5   much did you have like in your wallet with you today, just

6   cash money, folding money, kind of a question.

7   Q.  And he answered that he couldn't recall or he did not

8   know?

9   A.  That's correct.

10  Q.  Okay.  Did you ask him specifically about if he has a

11  wallet?

12  A.  Yes.

13  Q.  What did he say?

14  A.  He said yes, he did.  And then Mr. Wagner asked him

15  could you take your wallet out and show us how much money

16  you have with you today, and he declined to do that.

17  Q.  Okay.  For a moment you mentioned Mr. Wagner.  Can you

18  explain for the Court who Mr. Wagner is?

19  A.  Jeffrey Wagner is the revenue officer that was my

20  witness to the interview, and he assisted me in date

21  stamping and organizing documents and taking some notes of

22  his own.  And on occasion he would ask a question or two,

23  but primarily I was the person doing the questioning and

24  Mr. Wagner would help out if he thought -- if he saw

25  something that I may have overlooked.

1   Q.  And Mr. Wagner was a revenue officer that was working

2   this file before you?

3   A.  Yes, he is the -- yes, as I previously said, he had the

4   case and he had a job opportunity and it was assigned to me

5   then.

6   Q.  So you said that, back to the question of this cash in

7   his wallet, Mr. Thornton was not willing to actually check

8   his wallet?

9   A.  He was unwilling to check the contents of his wallet.

10  Q.  Okay.  There's a topic of a motorcycle transfer.  Can

11  you tell me a little bit about what's the background or your

12  interest in a motorcycle?

13  A.  Well, from the existing case file there had been some

14  mention of a motorcycle owned by Mr. Thornton that was --

15          MR. THORNTON:  Objection, speculation.

16          THE COURT:  Overruled.

17          THE WITNESS:  -- that was transferred to

18  Mrs. Thornton.  And I believe the file said that he has a

19  motorcycle license but I don't believe it said that

20  Mrs. Thornton had a motorcycle license.  But a research of

21  motor vehicle records did not show a current registration

22  for a motorcycle for Mr. Thornton.

23  BY MR. SAMIE:

24  Q.  Okay.  Did you -- what would be the relevance of this

25  motorcycle?

1    A.   What would be the what?

2    Q.   Well, why are you interested in this motorcycle?

3    A.   Well, thus far he had been unable to identify that he

4    owned any asset other than, I guess he said, the shirt off

5    his back.  And this was the only asset thus far, and also

6    money in this TCF Bank checking account.  But if it's an

7    asset that he could sell to help pay his large tax

8    liability, it's not an asset that he needs for production of

9    income or for his health and safety of his family or

10   anything like that.  It's kind of a luxury item that if it's

11   free and clear, we could get him to sell it and/or we could

12   sell it for him and get some funds to decrease his tax

13   liability.

14   Q.  And you mentioned that your records showed some transfer

15   of the ownership of this vehicle or registration of the

16   vehicle from Mr. Thornton to his wife; is that correct?

17   A.  Yes, but this was not my research.  It was older

18   research from Mr. Wagner.

19   Q.  Okay.  But you were looking for some detail about if

20   that occurred or when that might have occurred?

21   A.  Yes.

22   Q.  Is there anything about the timing of it that was

23   particularly curious?

24   A.  Yes, if the transfer happened after we filed our notice

25   of federal tax lien at the courthouse, well, then subject to

1    certain limitations concerning vehicle priorities and

2    security interests, that motorcycle might have been

3    transferred with our lien attached to it.

4    Q.  What -- when you asked Mr. Thornton yesterday for

5    details about this motorcycle and the transfer of the

6    motorcycle, what was -- what did he say in response?

7    A.  He was quite evasive.  He didn't recall the details of

8    it.  He didn't -- he says it's my wife's business; or I

9    said, Well, does she -- when you come home from work do you

10   see the motorcycle in the garage?  Is it still there?  And

11   he didn't wish to discuss that.  He said he had no

12   ownership, security interest or beneficial interest in the

13   motorcycle.

14   Q.  Consistent with his answers to your other questions

15   about his assets?

16   A.  Yes.

17   Q.  Okay.  Did you ask him anything about precious metals or

18   coins or any sort of affiliation he has with assets like

19   that?

20   A.  Yes, I did.

21   Q.  Tell me about what you asked him, what he responded?

22   A.  I asked him if he was still conducting transactions with

23   a coin dealership in Arizona.  And he couldn't recall those

24   things and he has -- he said he had no ownership interest,

25   beneficial interest, or security interest in anything like

1    that.

2    Q.  Did he say anything about -- I guess did he say anything

3    about the trust ownership of precious metals?

4    A.  He said that he didn't recall that there was any

5    ownership interest, and I believe he said that he was there

6    to answer questions about John Thornton and not answer

7    questions about the trusts.

8    Q.  Okay.

9              MR. SAMIE:  May I have a moment, Your Honor --

10             THE COURT:  You bet.

11             (Pause in proceedings.)

12             MR. SAMIE:  Your Honor, I don't have anymore

13   questions at this time.

14             THE COURT:  Very good.  Thank you.

15             Mr. Thornton, you may ask questions of the

16   witness.

17                      **CROSS-EXAMINATION**

18   **BY MR. THORNTON:**

19   Q.  Mr. Wallin, what type of tax are you investigating me

20   for?

21   A.  Personal income tax.

22   Q.  Is it subtitle A, subtitle B, subtitle C, subtitle D,

23   various excise taxes, subtitle E, alcohol, firearms and

24   tobacco, or is it under the Buck Act of 1940?

25             MR. SAMIE:  Objection, Your Honor.  Calls for a

1    legal conclusion.

2              THE COURT:  What section of the code are you

3    referring to, sir?

4              MR. THORNTON:  Title 26.  Mr. Wallin, I assume, is

5    well versed and learned in the --

6              THE COURT:  Title 26, what section?

7              MR. THORNTON:  I don't have that.

8              THE COURT:  All right.  I think he has answered

9    your question.  Clearly every individual has to pay income

10   tax liabilities.  So if you have a legal argument about why

11   you might not have to pay it, that has nothing to do with

12   these proceedings.  When the IRS is collecting information

13   to evaluate your income tax liability, you are obliged to

14   provide it.

15             MR. THORNTON:  Well, the type of tax is important.

16   And the "individual" is defined as a means in 5 U.S.C. 552a,

17   the term "individual" means a citizen of the United States

18   or alien lawfully admitted for permanent residence.

19             THE COURT:  Well, you are a citizen of the United

20   States for the period 2004 through 2012, sir.

21             MR. THORNTON:  No, ma'am, I'm not.

22             THE COURT:  Well, this document that you have

23   provided to us today from Alaska renounces your citizenship

24   in 2016.  So yes, you were.

25             MR. THORNTON:  It's retroactive in the content of

```
 1    it.
 2              THE COURT:  All right.  Let me explain to you that
 3    that's a legal argument you can attempt to make, but right
 4    now the question is factual.  That is what information have
 5    you provided to the IRS who have reasonably asked you for
 6    information to support your income tax liability for the
 7    year 2004 to 2012 where you never filed any returns.
 8              So let's not focus on whatever legal arguments you
 9    want to make in a future proceeding by the IRS against you.
10    We're limited to these administrative summonses today, okay?
11              MR. THORNTON:  I provided all the documents that I
12    had in my possession, that I had ownership, security, and
13    beneficial interest in.
14              I do have a question for Mr. Wallin.
15    BY MR. THORNTON:
16    Q.  Can you please provide for me a copy of the
17    registration -- you said I had a motorcycle registered in my
18    name.  Could you please provide that?
19    A.  There was information in the file.  It might have been
20    case history notes of Mr. Wagner.  I don't -- that's why I
21    was asking you questions.  I wanted to clear that up in my
22    mind what happened with that motorcycle.
23    Q.  I have never had a motorcycle titled in my name but I
24    would like you to produce the document that says I did.
25    A.  Okay.  And --
```

1          THE COURT:  You can ask him questions but you

2     can't require him to do anything here today.  You can

3     dispute whether you had a motorcycle in your name or not.

4     You can ask him a question, but it's not your role --

5          MR. THORNTON:  Well, he --

6          THE COURT:  -- excuse me, sir, to demand anything

7     of him right now.

8          MR. THORNTON:  Well, he's giving testimony under

9     oath and I would think it would be based on facts currently

10    within his knowledge.

11         THE COURT:  You can make argument but you can't

12    make a demand of him, okay?

13    BY MR. THORNTON:

14    Q.  Mr. Wallin, are you familiar with what a withholding

15    agent is?

16    A.  No.

17    Q.  Are you familiar with Section 7701 of the Title 26?

18    A.  No.

19    Q.  Let me read it for you.  "Withholding Agent.  The term

20    'withholding agent' means any person required to deduct and

21    withhold any tax under the provisions of Section 1441, non-

22    resident alien; 1442, foreign corporation; or 1443, foreign

23    organization; or 1461, hold harmless if you withhold for any

24    of these entities."  Which of those is me?

25         MR. SAMIE:  Objection, Your Honor, as calling for

1    a legal conclusion.

2              THE COURT:  It's also not relevant.  The IRS is

3    assuming you're a citizen, sir.  You know that.  You can

4    contest whether you are a citizen in those years but that's

5    not the appropriate question to ask him right now.

6    BY MR. THORNTON:

7    Q.  Mr. Wallin, I'm curious.  The documents I brought you

8    were under threat, duress and coercion.  You were very

9    unclear in this summons what type of documents.  You didn't

10   name any entities within the summons.  I simply brought

11   those in because I wanted to take care of this contempt

12   issue and that was my attempt to do so.

13             But you did not -- I provided those documents

14   outside the scope of your summons.  The summons did not

15   specify the names of any of those trusts.  You just said

16   trusts.  But it was very specific in your document in that

17   you stated that anything you have ownership, security

18   interest or beneficial interest in.

19             By the evidence I provided, it's clear I do not

20   have any ownership, beneficial or security interest in those

21   documents regardless of how salacious the conduct was of

22   the -- of how the monies were dealt with within the trust

23   organization.

24             MR. SAMIE:  Objection, Your Honor.  That entire --

25   I didn't hear a question there.  That was all argument.

1    BY MR. THORNTON:

2    Q.  So my question to you, Mr. Wallin, is why didn't you

3    specify with more clarity in your summons document the

4    entities that you ended up asking me about at our meeting?

5    A.  I did not serve that -- prepare that summons.

6    Q.  Well, why didn't Mr. Wagner?

7    A.  You'd have to ask him.

8            MR. THORNTON:  Can we get Mr. Wagner on the stand?

9            THE COURT:  Well, I'm not sure what the point is.

10   If you have any other questions about the testimony today of

11   Mr. Wallin you're welcome to ask him.

12           MR. THORNTON:  I have no further questions.

13           THE COURT:  Mr. Samie, anything further?

14           MR. SAMIE:  I don't have any further questions.

15           THE COURT:  Mr. Wallin, you may step down.

16           Mr. Thornton, I would like you to take the witness

17   stand now, please.  And I appreciate, sir, that you do not

18   believe in giving an oath.  I will respect that wish and we

19   will just do an affirmation then.

20           THE WITNESS:  I will not affirm.

21           THE COURT:  Well, you did so when you renounced

22   your citizenship.  You said in that document -- and I will

23   read it to you --

24           THE WITNESS:  I believe I cited Matthew 5:33-37,

25   and my yes will be yes and my no will be no.

1          THE COURT:  It says:  "I, under my deeply-held

2     religious beliefs, do not swear oaths, but this has the same

3     force and effect as an oath as I will state that the answer

4     to all the facts in this document is the truth, the whole

5     truth, and nothing but the truth."

6          I am asking you to raise your right hand and tell

7     me that the testimony you're about to give is just that.

8     The truth, the whole truth, and nothing but the truth.

9          MR. THORNTON:  It is.

10          THE COURT:  Please raise your right hand and say

11     it.

12          MR. THORNTON:  It is.

13          THE COURT:  All right.  Please be seated.

14                         **EXAMINATION**

15     **BY THE COURT:**

16     Q.  Were you employed from 2004 to 2012, sir?

17     A.  Employed, I was not.

18     Q.  Did you receive any income during those years?

19     A.  I did not.

20     Q.  How did you survive without income?

21     A.  My wife works.  Has always worked.

22     Q.  So you never received any paychecks or any income from

23     2004 to 2012?

24     A.  I did not.

25     Q.  Why did you provide the U.S. Bank documents to Officer

1    Wallin?

2    A.  Fear.

3    Q.  What do the U.S. Bank documents show?

4    A.  They show banking activity.  And the part of the reason

5    I provided them is because that account was third-party

6    summons back in 2001, 2002, 2003 and an alleged tax

7    liability was generated against the monies in that account

8    unrelated to me.

9    Q.  All right.  My understanding from the letter that you

10   wrote that you've provided to us as Attachment A, the last

11   paragraph on the first page says:  "As a volunteer trustee

12   with authority to manage activities and funds on behalf of

13   Freedom Enterprises, I can access bank statements regarding

14   a bank account holding funds on behalf of Freedom

15   Enterprises."  Is that true or false?

16   A.  That's true.

17   Q.  All right.  So you had the ability from 2004 to 2012 to

18   access this U.S. Bank account that is represented by

19   Attachment E; is that correct?

20   A.  I didn't retain the bank statements.  I attempted to get

21   all the bank statements I could when this issue arose about

22   books and records.  I did not retain the bank records.

23   Q.  Did you make any deposits into this account for any of

24   those years?

25   A.  Did I?

1    Q.  Yes.

2    A.  The trust -- the trust made deposits, yes.

3    Q.  Well, the trust isn't a person.  Who made the deposits?

4    A.  As trustee I made the deposits.

5    Q.  As trustee you made the deposits in that account?

6    A.  Yes.

7    Q.  All right.  And, for instance, you heard me ask about

8    Grove Technical.  What is Grove Technical?

9    A.  That is a company that Freedom Enterprises contracted

10   with for services.

11   Q.  All right.  And Grove Technical provided services to

12   Freedom Enterprises?

13   A.  Freedom Enterprises provided services to Grove

14   Technical.

15   Q.  And Grove Technical paid for those services?

16   A.  They paid Freedom Enterprises for those services, yes,

17   under contract.

18   Q.  Did you provide any services on behalf of Freedom

19   Enterprises to Grove Technical?

20   A.  I provided volunteer services on behalf of Freedom

21   Enterprises, yes, for the benefit of Freedom Enterprises.

22   Q.  So you believe that the services were volunteer but

23   Grove Technical paid for those services by these deposits

24   into the trust?

25   A.  Paid to the trust, yes.

1    Q.   Okay.  So for how many years did you provide these

2    services to Grove Technical?

3    A.   I -- best of my recollection, two or three years.

4    Q.   Were there any other services that you provided to any

5    other organization that deposited money into this account?

6    A.   No.

7    Q.   These withdrawals, these dozens and dozens of $500

8    withdrawals, did you ever make one of those withdrawals?

9    A.   I did, yes.

10   Q.   Did you make all of them?

11   A.   Yes.

12   Q.   All right.  Are there any other accounts out of which

13   you made withdrawals of funds from 2004 to 2012?

14   A.   No.

15   Q.   Did you provide any other volunteer services to any

16   other organization, as you define "volunteer," from 2004 to

17   2012 other than Grove Technical?

18   A.   There were, but I can't recall.  It's been so many

19   years.

20   Q.   And for those services, did those entities pay monies

21   into this trust account?

22   A.   Under contract with Freedom Enterprises, yes.

23   Q.   They did.  Okay.

24        Then at some point in time you opened an account

25   with TCF.  Is that right?

1    A.   Correct.

2    Q.   Now, as Mr. Samie pointed out, there is a gap in these

3    records so they go from 2001 to June of 2013 and then

4    there's a four-year gap in these U.S. Bank records.  We then

5    pick up in December of 2017.

6    A.   According to the summons I was to provide records from

7    2004 to 2013, which I did.  Mr. Wallin then asked to get

8    records for bank accounts from December of 2017 up until the

9    meeting.  A summons did not direct for the bank records

10   beyond 2013.

11   Q.   Let's talk about the two other trusts.  Independent

12   Liberties Trust and the Business Management Alliance Trust.

13   Did you provide what you call volunteer services on behalf

14   of those trusts for which those trusts were paid at any

15   time?

16   A.   I did not.  The trust entities remain but they are not

17   currently active.

18   Q.   Do these $500 withdrawals on these -- why, to look at

19   bank records going back before May 2nd of 2011, to 2004,

20   would they be similar?  Did you make these $500 withdrawals

21   going back to 2004?

22   A.   Best recollection, possibly.

23   Q.   For all of those years?

24   A.   If there was activity, probably.

25   Q.   All right.  And you were under the belief that you could

1    get that income without paying taxes on it?

2    A.  I'm not a citizen of the United States.  I'm a citizen

3    of Minnesota.  And I don't receive the benefit.  The monies

4    that were taken from the account were rolled into

5    investments according to my contract of indenture.

6    Q.  There was monies put into an investment fund?

7    A.  No, I didn't say investment fund.  I said investments.

8    Q.  What do you mean by that?

9    A.  Various commodities.

10   Q.  Somebody purchased a commodity with this money?

11   A.  Yes.

12   Q.  And where are the accounts that show those commodities?

13   A.  They weren't accounts.  They were solid assets.

14   Q.  Give me an example of a commodity, please?

15   A.  An ounce of gold.

16   Q.  Do you have any gold?

17   A.  I do not have any ownership or beneficiary security

18   interest in any gold.  The trust does, but I do not.

19   Q.  And is that physically in your possession?

20   A.  It's under my control and the control of the other

21   trustees.

22   Q.  Where is it physically located, the gold?

23   A.  Some is stored in my wife's home and some in other

24   places.

25   Q.  Have you ever turned that gold into cash?

1   A.  No.

2   Q.  How much gold are we talking about?

3   A.  I don't recall off the top of my head.  I really don't.

4   Q.  Were there other commodities that were purchased with

5   this money?

6   A.  Some.  Some rare coins on behalf of the trust.

7   Q.  And where are those rare coins physically located?

8   A.  Some are at my wife's home.

9   Q.  Where are the other ones?

10  A.  With other trustees.

11  Q.  Have those rare coins ever been sold and converted into

12  cash?

13  A.  No, they have not.

14  Q.  Has your wife ever provided you access to any of this

15  gold or rare coins?

16  A.  Provided me access?

17  Q.  Yes.

18  A.  She's not familiar with it.

19  Q.  She doesn't know that there's gold and rare coins in her

20  home?

21  A.  No, we live private separate lives.

22  Q.  But they are located in her home but she doesn't know

23  about it?

24  A.  Correct.

25  Q.  Any other commodities other than gold and rare coins?

1    A.  No.

2    Q.  Does the trust have other commodities in its possession

3    such as gold or rare coins or other investments?

4    A.  Does the trust?

5    Q.  Yeah.

6    A.  I just explained that it does.

7    Q.  Other than the ones in your wife's home?

8    A.  Yes.

9    Q.  And where are those physically located?

10   A.  In Washington.

11   Q.  Washington state or Washington, DC?

12   A.  Washington state.

13   Q.  Is that in the home of another trustee?

14   A.  They are in a storage facility.

15   Q.  There is a storage facility in Washington state?

16   A.  It's -- one of the other trustees might know, but I hold

17   the majority of it.

18   Q.  You have the majority of the gold and rare coins?

19   A.  In trust, right.

20   Q.  All right.  Can you quantify for me how much we're

21   talking about in terms of gold that you have physical

22   possession of?

23   A.  Honestly I can't.

24   Q.  Well, give me a ballpark.  You must have some idea.

25   A.  80, 80 ounces, 90 ounces.

1    Q.  And what is the value of the rare coins that you have in

2    your possession?

3    A.  I haven't looked at them in a long time.  They have been

4    in possession for a long time.  I don't know what the

5    current price on those is.

6    Q.  Give me a ballpark.

7    A.  $150,000.

8    Q.  Do you have any other assets like that in your

9    possession?  I know you believe they belong to the trust and

10   you exercise some control over them, but are there any other

11   such assets physically in your possession?

12   A.  Some silver.

13   Q.  How much silver?

14   A.  500 ounces.

15   Q.  Anything else?

16   A.  No.

17   Q.  Any other bank accounts that would show an investment in

18   a stock or a bond?

19   A.  I don't believe in those investments.

20   Q.  Any real estate.  Do you own any real estate?

21   A.  I do not.

22   Q.  Does the trust own any real estate?

23   A.  It does not.

24   Q.  Does the trust own a home or a dwelling of any kind?

25   A.  It does not.

1    Q.  Does it own a boat?

2    A.  It does not.

3    Q.  Does it own any real property?

4    A.  It does not.

5    Q.  Does the trust have any bank accounts other than the

6    ones you have disclosed?

7    A.  It does not.

8    Q.  And is that true of these other two trusts, as well?

9    A.  Yes.  Only Freedom Enterprises has the banking entity.

10   Q.  So Independent Liberties Trust has no bank account and

11   no assets?

12   A.  That's correct.

13   Q.  For any of the trustees?

14   A.  Say that again?

15   Q.  None of the trustees who are part of that trust have

16   bank accounts or --

17   A.  No.

18   Q.  And that's true of the Business Management Alliance

19   Trust?

20   A.  Correct.

21   Q.  What is the purpose of the Independent Liberties Trust?

22   A.  To hold various assets, to diversify assets.  One trust

23   would hold a particular class of asset.

24   Q.  I thought you just told me they didn't have --

25   A.  They don't have any, but that's what their use is.

1    Q.  And that's true of the Business Management Alliance

2    Trust?

3    A.  Correct.

4    Q.  At any time from 2001 until 2012, did they hold assets?

5    A.  They did not.

6    Q.  So they came into being to hold assets but at no time

7    during that period of time --

8    A.  They did not acquire -- no assets were acquired by them,

9    no.

10   Q.  Are you currently working?

11   A.  I am.

12   Q.  Who do you work for?

13   A.  Involve IT.

14   Q.  And what kind of work do you do?

15   A.  Computer consulting work.

16   Q.  What is your annual salary?

17   A.  I get paid hourly.

18   Q.  What's your hourly?

19   A.  $70, I believe.

20   Q.  What was your income for 2017 from Involve IT?

21   A.  I'd have to look at the W-2.  I think it was about

22   $50,000.

23   Q.  Do you have any other source of income at the moment?

24   A.  I do not.

25   Q.  Where do you live?

1    A.  In my wife's home.

2    Q.  What is the value of that home?

3    A.  I don't know.

4    Q.  Does your wife have separate bank accounts?

5    A.  Yes.

6    Q.  Do you have any access to the funds?

7    A.  I do not.

8    Q.  Does she pay you any monies out of those accounts?

9    A.  She does not.

10   Q.  Did you ever invest or deposit any monies into those

11   accounts?

12   A.  I did not, no.

13   Q.  Does she have vehicles?

14   A.  She does.

15   Q.  And do you use those vehicles?

16   A.  Yes.

17   Q.  What vehicles do you use?

18   A.  I use a 2001 Honda and a 2000 GMC truck.

19   Q.  Did your wife ever own a motorcycle?

20   A.  Yes.

21   Q.  When was that?

22   A.  She bought one in 2006.

23   Q.  Does it still exist?

24   A.  She traded it in for a different motorcycle.

25   Q.  When was that?

1    A.  2009, I believe.

2    Q.  Did you ever make payments on those cars or those

3    motorcycles?

4    A.  I do not.

5            THE COURT:  All right.  Mr. Samie, do you have any

6    questions of Mr. Thornton?

7                      **CROSS-EXAMINATION**

8    **BY MR. SAMIE:**

9    Q.  Mr. Thornton, what is your wife's address where you

10   live?

11   A.  4128 Utica Avenue South.

12   Q.  4128 what was it?

13   A.  Utica Avenue South.

14   Q.  Where is that?

15   A.  In St. Louis Park, Minnesota.

16   Q.  What's the zip?

17   A.  I don't know.  I can't remember the zip.  I don't really

18   use zips.

19   Q.  The storage facility in Washington, where is that?

20   A.  I don't know.  One of the trustees deals with that.

21   Q.  Whose name is the storage facility in?

22   A.  I don't know.

23   Q.  Which trustee deals with that?

24   A.  I can't -- I can't remember.

25   Q.  Can you find out?

1    A.  Yeah, I can find out.

2    Q.  Can you find out where the storage facility is?

3    A.  I'll ask them.

4    Q.  But it's your testimony that the contents in that

5    storage facility are yours, I think you said?

6    A.  No, I did not.  I said they are Freedom Enterprises.

7    They belong to Freedom Enterprises.  All the assets belong

8    to Freedom Enterprises.

9    Q.  Okay.  Those were generated, though, from the cash that

10   you withdrew and purchased?

11   A.  Yes.

12   Q.  Okay.  All of the contents of that storage facility was

13   obtained through the cash you withdrew from this?

14   A.  Yes.

15   Q.  You mentioned that you made all the withdrawals.  The

16   deposits, did you make all the deposits?

17   A.  Yes.

18   Q.  Okay.  How much cash do you have on hand?

19   A.  I don't know off the top of my head.

20   Q.  Approximately how much?

21   A.  A few thousand dollars.

22   Q.  Ten thousand?

23   A.  A said a few thousand dollars.

24   Q.  Above or below ten?

25   A.  Below.

1    Q.  Is there -- are -- is there record of any title for any

2    of these gold coins, silver coins assets that has them in

3    the name of the trust?

4    A.  They were purchased with the trust and there's minutes

5    about investing in hard assets, so yes.

6    Q.  Do you have those minutes?

7    A.  I don't.

8    Q.  Can you get those minutes?

9    A.  I think so.

10   Q.  Okay.  Would there be any other sort of evidence showing

11   the title or ownership for these assets in the name of the

12   trust?

13   A.  They are hard assets.  They were purchased with trust

14   funds, so they are in fact assets of the trust.

15   Q.  Are there receipts of purchase for those?

16   A.  The type of investments, there are no receipts, no.

17   That's why -- that's why cash was used because dealers of

18   precious metals don't deal in checks.  They want to make

19   sure that cash in hand.

20   Q.  But using cash doesn't necessarily mean that there's no

21   receipt.

22   A.  Oh, receipts were never generated.

23   Q.  Who were the precious dealers that you purchased

24   these --

25   A.  Oh, just various shows.

```
 1    Q.   Where?

 2    A.   There's a big show in Brooklyn Center.

 3    Q.   What's the name of the vendor?

 4    A.   It was a -- I don't remember the name of the vendor.

 5    It's -- I can't remember the name of the show.  There's

 6    various vendors there.

 7    Q.   Can you find out?

 8    A.   I don't remember.

 9    Q.   Okay.

10    A.   Some was purchased at -- I think it's Great Lake Coins

11    down in Burnsville.

12    Q.   I noticed that the recent -- I guess there's less

13    activity in the U.S. Bank, the U.S. Bank account for the

14    trust.  Have you -- I guess why -- since when has it been

15    less active or do you agree with me that it's less active

16    now?

17    A.   Yes, it's less active.

18    Q.   Since when?

19    A.   Probably going back to March, March of last year, April

20    of last year.

21    Q.   Is that approximately around the same time you then

22    opened up the TCF account?

23    A.   I opened the TCF account in September.

24    Q.   In 2017?

25    A.   2017.
```

1   Q.  So where -- was there any bank account or anything like

2   that for storage of these assets in that interim period or

3   was there just less activity?  What were you doing in terms

4   of income for that period of time?

5   A.  I wasn't.  There wasn't any activity.  I wasn't working.

6   There was no -- there was no contract for the trust to

7   fulfill.  It wasn't anything.

8   Q.  So there's no income during that time coming into you?

9   A.  No.

10   Q.  Or to the trust?

11   A.  No.

12   Q.  Okay.  Do you have access to or knowledge where the

13   metals and gold coins stored in your wife's home, do you

14   have access to them?

15   A.  Yes.

16   Q.  But you said your wife does not have access to them?

17   A.  She does not.

18   Q.  Are they kept in some sort of a safe?

19   A.  Yes.

20   Q.  And where is that safe?

21   A.  In the basement of my wife's home.

22          MR. SAMIE:  Your Honor, may I have a moment?

23          THE COURT:  Of course.

24          (Pause in proceedings.)

25          THE COURT:  Mr. Samie, I have a change of plea

1      that was scheduled to go at 11:00.  Would you like some

2      time?  We could resume this hearing at 12:30.  That's my

3      thinking.

4                  MR. SAMIE:  That would be great, Your Honor, if

5      that works.  I don't have many questions left but it would

6      be helpful to --

7                  THE COURT:  To evaluate where we're at?

8                  MR. SAMIE:  To evaluate, yes, Your Honor.

9                  THE COURT:  Okay.  So, Mr. Thornton, you can step

10     down.  I will order you back here at 12:30 p.m.

11                 Court is briefly adjourned.

12                 (Recess taken from 11:14 a.m. to 12:33 a.m.)

13                 THE COURT:  Mr. Samie, do you wish to ask any

14     further questions of Mr. Thornton?

15                 MR. SAMIE:  Briefly, Your Honor.

16                 THE COURT:  Okay.  Mr. Thornton, why don't you

17     come on back up to the witness stand.

18                 THE WITNESS:  Before Mr. Samie begins, I want to

19     correct the record of a previous statement of activity that

20     I had forgotten back in 2004 where I retained ownership of

21     all the trust assets.  One of the trustees left so I took

22     the storage capacity back.  I was under a lot of pressure

23     and I had forgotten about it.  It's been a long time.

24     BY MR. SAMIE:

25     Q.  Okay.  This is the storage facility?

```
 1    A.  From the trustee that had it in Washington.  I retained

 2    it.  I now hold all trust assets.

 3              THE COURT:  As of today?

 4              THE WITNESS:  No, this was back 2004-2005.  I just

 5    forgot about it.  I was under a lot of pressure.  I had

 6    forgotten about it.  I just want to correct the record.

 7              MR. SAMIE:  I appreciate that.

 8    BY MR. SAMIE:

 9    Q.  Does anyone else have access to the storage locker?

10    A.  No.

11    Q.  So you would be able to provide the -- do you have the

12    address of the storage?

13    A.  I don't -- it's not even being serviced anymore.  Once I

14    retained, the trustee was off.  I don't even know where it

15    is.  He is the one that stored it, but I got it back in the

16    2004-2005 timeframe.  I never visited.  I've never been

17    there.

18    Q.  I'm sorry.  I don't know that I understand.  You're

19    saying -- what is it that you obtained?  What was stored in

20    the storage locker?

21    A.  Correct, correct.

22    Q.  Okay.

23    A.  For the trust.

24    Q.  All right.

25    A.  Right.
```

```
1    Q.  Give me a second.

2    A.  Um-hum.

3    Q.  Because I just want to make sure we're on the same page.

4    A.  Yep.

5    Q.  You have never been to this storage facility?

6    A.  No.

7    Q.  But it's your understanding that there were items of

8    value stored in the storage locker?

9    A.  Yes.

10   Q.  Okay.  And when you say that you obtained the items of

11   value that were in the storage locker, is that your

12   testimony?

13   A.  Yes.

14   Q.  And that happened in 2004?

15   A.  Roughly 2004-2005.

16   Q.  Where are those items located now?

17   A.  They are located in a safe that's owned by the trust in

18   my wife's basement.

19   Q.  Okay.  Who has access to that safe?

20   A.  Only me.

21   Q.  Does anyone else have the combination or key to that

22   safe?

23   A.  No.

24   Q.  Okay.  How large is this safe?

25   A.  I -- five-and-a-half feet tall, two-and-a-half feet
```

1    wide.  Something like that.

2    Q.  Okay.  And how much does it weigh?

3    A.  I don't even know.

4    Q.  When was the last time you viewed the contents of the

5    safe?

6    A.  It's been a while.  I haven't opened it in quite a

7    while.

8    Q.  But you're the only one that has access to it?

9    A.  Correct.

10   Q.  Okay.  And the last time you opened it, it had these

11   items of value in there?

12   A.  Yes.

13   Q.  Okay.  Who provided you those materials, those items of

14   value from the Washington --

15   A.  I don't remember the trustee's name.

16   Q.  You said you testified before that you could find out

17   the name of the trustee?

18   A.  I think so, yeah.

19   Q.  Okay.  And how would you go about doing that?

20   A.  I don't know where he is.  I don't know how to get a

21   hold of him.

22   Q.  So -- you said you think you could obtain that

23   information.  How would you do that?

24   A.  I'd have to contact somebody on the board and see if

25   they could locate them.

1    Q.  Who would you contact on the board?

2    A.  Probably the chairman of the board.

3    Q.  Is that --

4    A.  But I don't think he's going to know.  Because he just

5    came on as a board member back in like 2012 or so.

6    Q.  Is this Mike Marsoun?

7    A.  Yes.

8    Q.  You haven't Mr. Marsoun's contact information?

9    A.  I do.  He was not the one that -- he was not the

10   trustee.

11   Q.  The trustee that transferred these assets to you?

12   A.  Yeah, right.  I actually drove out to Washington and got

13   them.

14   Q.  Would Mike Marsoun have the -- well, let me back up

15   here.  Do you have the documents regarding the creation of

16   the trust, any documents associated with the creation of the

17   trust?

18   A.  I would have to contact the Board of Trustees.

19   Q.  The same person, Mike Marsoun?

20   A.  Yes.

21   Q.  Anybody else?

22   A.  I'd have to look at the documents and see that the board

23   members.

24   Q.  You would have to look at what?

25   A.  I'd have to look at the board members and see what the

1    other board members are.  I'm mainly dealing with Mike

2    Marsoun.

3    Q.  What documents would you have to look at?

4    A.  The minutes.

5    Q.  Do you have the minutes?

6    A.  I think so.

7    Q.  You have the minutes of the board meetings dating back

8    to when?

9    A.  I'd have to look.

10   Q.  Approximately?

11   A.  2000.

12   Q.  2000.  Do you have those in your possession?

13   A.  I think so.

14   Q.  Where would those be?

15   A.  In the same safe.

16   Q.  In the same safe?

17   A.  Um-hum.

18   Q.  Okay.  And you can provide those to IRS?

19   A.  Yes.  If I have to, yes.

20   Q.  Okay.  Did you speak to anybody over this break between

21   when you stepped off the stand until now?

22   A.  I called some friends.

23   Q.  Did you speak to anybody about this case?

24   A.  Yes.

25   Q.  Okay.  Who did you talk to?

```
 1    A.   Ralph Winterrowd.

 2    Q.   What did you talk about?

 3    A.   Just what was going on, what was happening.

 4    Q.   Who was Ralph Winterrowd?

 5    A.   Just a friend from Alaska.

 6    Q.   Where is he presently located?

 7    A.   He's in Wasilla.

 8    Q.   Who else did you talk to?

 9    A.   My wife.

10    Q.   What did you -- well, anybody else?

11    A.   No.

12    Q.   Other than the items of value that you testified, the

13    precious metals that were purchased with the withdrawals

14    from the U.S. Bank account, were there any other items that

15    were purchased with that money?

16    A.   No.

17    Q.   That money was only spent, the cash withdrawals were

18    only spent to purchase the precious metals that are

19    currently in the safe in the basement of your wife's home?

20    A.   Yes.

21    Q.   What about your withdrawals from your TCF account?  What

22    did you use that money for?

23    A.   Donations.

24    Q.   Donations to where?

25    A.   Various orthodox Christian organizations.  I helped my
```

1    mom with some medical bills.  She had open heart surgery a

2    couple years ago.

3    Q.  Did you use that cash to purchase anything of value?

4    A.  No.

5    Q.  Do you have any record of the donations that you made?

6    A.  No.

7    Q.  Other than the assets that are in the safe that we've

8    talked about -- well, what else is in the safe?

9    A.  Paperwork.

10   Q.  Paperwork relating to what?

11   A.  Mostly the business, business trust.

12   Q.  The business trust being the Freedom Enterprises?

13   A.  Yes.  Yes.

14   Q.  The contracts, those types of things?

15   A.  Yeah, I think some might still be there, but yes.

16   Q.  Okay.  Which would reflect the income generated by the

17   entity?

18   A.  Yes.

19   Q.  Okay.  Anything else other than business documents?

20   A.  A couple of guns.

21   Q.  Okay.  Are there any other guns located on the premises?

22   A.  Yes.

23   Q.  Okay.  Where?

24   A.  Underneath my bed.

25   Q.  Okay.  Other than the precious metals, the items of

1     value, are you aware of any other assets that are owned by

2     the trust, the Freedom Enterprises trust?

3     A.  No.

4     Q.  No.  You don't own anything else of value for that

5     entity, for the trust?

6     A.  Other than some of the collectible coins, but those are

7     gold coins, but no.

8     Q.  And those are all located in the same place?

9     A.  Yes.

10    Q.  Okay.

11            MR. SAMIE:  I think that's all I have, Your Honor.

12            THE COURT:  Thank you, Mr. Samie.  Just a few

13    questions, Mr. Thompson.

14                          **RE-EXAMINATION**

15    **BY THE COURT:**

16    Q.  Other than Mr. Marsoun, can you identify for me the

17    names of any trustees now or in the past of the Freedom

18    Enterprises Trust?

19    A.  I think there was a Henry D. Scott or I think there was

20    a David Carroll Stephenson at that time.

21    Q.  You've got to speak a little louder into the microphone.

22    A.  A David Carroll Stephenson at one time.

23    Q.  Okay.  And the minutes that you have in the safe, would

24    that be up to date?  Would that be up 'til the present?

25    A.  I believe so.  I'd have to look, though.  It's been a

1    long time since I've looked at all of that.

2    Q.  Does the trust still have meetings?

3    A.  Yes.

4    Q.  And do you attend those meetings?

5    A.  By telephonically, yes.  If I was -- yes.

6    Q.  Do you have health insurance?

7    A.  My wife's got COBRA.

8    Q.  Is she currently employed?

9    A.  Not currently, no.

10   Q.  Who pays for your food?

11   A.  Well, right now, me.

12   Q.  And with what funds do you do that?

13   A.  The TCF Bank account from the money I earn for myself.

14   Q.  During the years that you were withdrawing funds from

15   the U.S. Bank account, did you use any of those funds to

16   purchase food for yourself?

17   A.  No, no.  Well, other than using it if I was on a

18   contract, I was permitted to the expense of lunch or so

19   forth if I was off site servicing a contract on behalf of

20   the trust.

21   Q.  Who paid for your food then?

22   A.  I was reimbursed.

23   Q.  Who paid for it?

24   A.  My wife.  My wife.  She has always worked.

25   Q.  And she paid for your food, she paid for your clothes?

1    A.   Um-hum, yep.

2    Q.   Does she own or rent the home?

3    A.   She owns it.

4    Q.   And does she have a mortgage on it?

5    A.   I think it's paid off.

6    Q.   And does she pay the insurance and taxes on that home?

7    A.   She does.

8    Q.   And she pays for your clothes as well?

9    A.   She does.

10   Q.   And you're legally married, am I correct?

11   A.   Yes.

12   Q.   So all of your daily living expenses are paid by her?

13   A.   Until recently.

14            THE COURT:  All right.  Anything further,

15   Mr. Samie?

16            MR. SAMIE:  Not at this time.

17            THE COURT:  All right.  Mr. Thornton, you may step

18   down.

19            THE REPORTER:  Could you spell Marsoun and

20   Winterrowd for me?

21            THE COURT:  I believe Marsoun is M-a-r-s-o-u-n.

22            THE WITNESS:  That's correct.

23            THE COURT:  But I don't have the other name.

24            Mr. Thornton, when you go back to your seat could

25   you spell that for her?  Yes, thank you.

1          THE WITNESS:  Winterrowd.  It's

2     W-i-n-t-e-r-r-o-w-d.

3          THE REPORTER:  Thank you.

4          THE COURT:  Okay.  Mr. Samie, any other evidence

5     today?

6          MR. SAMIE:  No, Your Honor.

7          THE COURT:  Okay.  What is the position of the

8     Government now that we've gotten some more information?

9          MR. SAMIE:  Well, Your Honor, this had been

10     helpful and more informative.  There's, as is expected with

11     obtaining documents and testimony, sometimes the testimony

12     leads to the need for additional document production.  Now

13     at this time the Government is at least pleased to see that

14     Mr. Thornton has been more responsive with his answers to

15     both the Government's questions and the Court's questions

16     today and so now -- but that doesn't mean that we're

17     satisfied that the summonses have completely been complied

18     with.

19          As we fashion a remedy to go forward, the

20     Government at this time -- it sounds like Mr. Thornton will

21     need an opportunity to obtain some of the materials that

22     we've asked for him to obtain.  And I don't -- I don't know

23     that I get the sense -- I think that he might need to be the

24     person to do that.  And those would include basically any

25     documentation that he has that relates to any of these three

1    trusts, including any origination documents and any meeting

2    minutes, and essentially any sort of records that are held

3    within this safe that he's referenced.

4          I don't see why that should take very long for him

5    to do.  The Court has obviously in its discretion a number

6    of options for how to approach getting compliance with its

7    order.

8          At this time the Government's not asking that

9    Mr. Thornton be taken into custody but perhaps a setting

10   forth a hard deadline, a short deadline, for him to get

11   these materials to the IRS and being ordered to provide

12   further testimony if deemed necessary.  And for every day

13   that he does not meet that deadline, that he be fined,

14   perhaps, a thousand dollars per day to ensure that we can

15   get this resolved promptly.

16         THE COURT:  Okay.  All right.  Just to be clear,

17   you've had a chance to consult with the agents here from the

18   IRS and what remains to be provided to them are any

19   documents pertaining to the trusts, whether they be

20   origination documents, meeting minutes, anything else; and

21   any other documents that may be contained in the safe with

22   regard to the commodities or anything else that he's

23   testified to today.  Is that sufficient then to satisfy the

24   requirements of the summonses?

25         MR. SAMIE:  At this time I believe so, Your Honor.

1    Again, if those materials would lead to additional, then we

2    seek the --

3              THE COURT:  But that's the direction we should put

4    him in right now to get those documents?

5              MR. SAMIE:  That's correct, Your Honor.

6              THE COURT:  All right.  Mr. Thornton, do you

7    understand that?  Do you understand what documents the IRS

8    is looking for, sir?

9              MR. THORNTON:  Vaguely, yes.

10             THE COURT:  Well, let's go right back to the

11   beginning because I don't want it to be vague at all.

12             MR. THORNTON:  Okay.

13             THE COURT:  When any trust is established there

14   are documents that establish that trust.

15             MR. THORNTON:  Yes.

16             THE COURT:  As you point out, there are meetings

17   and there have been meetings for years, some of them

18   telephonic.  Minutes have been kept of those meetings.  They

19   are in writing.  You believe they are all in your safe.

20             We talked about the other items in your safe,

21   whether there might be evidence of the vendor identity or

22   receipts or anything that goes with the precious metals and

23   the like that are in the safe.  So you are ordered to gather

24   all those materials and provide them to the IRS.

25             Mr. Samie, do you want that directly or through

1    you?

2              MR. SAMIE:  Directly with Revenue Officer Wallin.

3              THE COURT:  You should be in contact with Revenue

4    Officer Wallin.  Schedule a meeting to occur no later than

5    10 days from today at which time you should appear with

6    those documents and swear to him, not on oath or

7    affirmation, but swear that you're telling the truth that

8    those are all the documents period in your possession.

9    Never mind what your relationship is with the trust or

10   anything else, in your possession or control that pertains

11   to these trusts or these commodities as you call them.

12   Okay?

13             MR. THORNTON:  Okay.

14             THE COURT:  Is that clear?

15             MR. THORNTON:  Yes.

16             MR. SAMIE:  Your Honor, if I may add to that, we

17   had also -- Mr. Thornton indicated that he has -- the burden

18   on him at this point is to show reasonable efforts to

19   comply; and I guess I just want to add that he has the

20   ability to seek some of these records that we have been

21   asking for from members of the Board of Trustees or the

22   trust.  He has that ability to do that.  And there's case

23   law saying that he needs to make a reasonable effort to do

24   what he can to get those materials to the Government.

25             THE COURT:  All right.

1              MR. SAMIE:  And so I just want to be careful not

2    to limit this exclusively to what he physically has on hand,

3    but what items he's able to reasonably obtain.

4              THE COURT:  Mr. Samie, I would suggest that you

5    actually draft what that letter might look like to the

6    current chairman of the board whose name I have now

7    forgotten -- Mr. Marsoun -- so that Mr. Marsoun understands

8    what documents the IRS is looking for.

9              And then, Mr. Thornton, as soon as Mr. Samie has

10   drafted that letter, I want you to provide that to

11   Mr. Marsoun.  You have to provide evidence that you have

12   mailed that to him or given it to him.  You've got to

13   provide that evidence to Mr. Samie and to the IRS and to the

14   Court.  And then ask for a quick turnaround of that

15   information within a week.

16             So we're going to try to get this all wrapped up

17   in ten days here.  But we're going to put a --

18             MR. THORNTON:  I would ask, Judge Nelson,

19   Mr. Marsoun right now I think is living in Hawaii and the

20   turnaround time is going to be a little bit longer.  I will

21   send it the quickest way.

22             THE COURT:  Okay.  You should send it in overnight

23   mail and ask him for a response in overnight mail.

24   Mr. Samie will include that in the draft letter that he

25   provides to you.

1          The bench warrant will be stayed until Tuesday,

2     May 22nd at 1:30, at which time I will either have learned

3     from the Government that there's no longer a need for the

4     hearing; or, if there is, we will resume and we will call

5     you to testify and we'll see where we are at that point.

6          Anything further from the Government today?

7          MR. SAMIE:  Nothing further from the Government,

8     Your Honor.

9          THE COURT:  All right.  Mr. Thornton, anything

10    else you wish to say today?

11         MR. THORNTON:  Question.  As far as the letter

12    that Mr. Samie is going to be drafting, will I be getting

13    that today?  When does the clock start?

14         THE COURT:  Why don't you chat with Mr. Samie

15    right after this and I'm sure he will tell you.

16         Okay.  Court is adjourned.

17         (Court adjourned at 12:56 p.m.)

18                    *     *     *

19

20

21

22

23

24

25

1          I, Carla R. Bebault, certify that the foregoing is

2     a correct transcript from the record of proceedings in the

3     above-entitled matter.

4

5

6                    Certified by:   s/Carla R. Bebault
                                     Carla Bebault, RMR, CRR, FCRR
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25